*Kelley & Follett, McIntire & McIntire, Weight & Moore,* and *J. W. Warrington,* for defendant.

---

## BENEFICIARY UNDER LIFE INSURANCE POLICY WITHOUT AN INSURABLE INTEREST.

[Circuit Court of Lawrence County.]

DAVID EVANS v. J. W. MOORE, AS ADMINISTRATOR OF GEORGIA HAMILTON MOORE.

Decided, October, 1905.

*Life Insurance—Beneficiary Named in Policy of—Must have an Insurable Interest in Life of Insured—Assignment of Policy—Authorities in Conflict.*

The case of *Eckle* v. *Renner,* 41 O. S., 232, though treated in the text-books as authority for the assignment of a life insurance policy to a person having no insurable interest in the life of the insured, and often cited in support of that proposition, is not decisive of that question; and the court in the present case, on reason, good conscience and public policy, and in view of the square conflict in the rulings of the courts in the various states, prefers to follow the federal courts and to hold that only those having an insurable interest in the life of the insured can become beneficiaries under a policy either by assignment or otherwise.

WALTERS, J.; CHERRINGTON, J., and JONES, J., concur.

The case of David H. Evans v. J. W. Moore, as administrator of Georgia Hamilton Moore is in this court on petition in error. In 1899, Georgia Hamilton, being then single and a resident of this county and a young lady about twenty-one years of age, took out three several policies of insurance upon her life, in what is known as the industrial companies. On November 2, 1902, she was married to the now defendant in error, J. W. Moore. On April 24, 1903, she executed what purported to be an assignment or substitution of the beneficiaries named in the policy, by which assignment or substitution she named the plaintiff in error, David H. Evans. And such assignment or substitution of the beneficiary was addressed to the company and signed by her and witnesses, providing that in the case of her death before the said David H. Evans, that the money should be paid upon these policies to the said Evans. In October, 1904, Mrs. Moore died. Before her death, however, she instituted a suit in replevin to recover the possession of the policies named, claiming that she was the owner of the same and therefore entitled to the possession. The case was tried after her death, the administrator being substituted in her person and stead; and, a jury having been waived, the case was submitted to the court below upon all the evidence and the exhibits, the court finding judgment for the plaintiff below. Error is prosecuted from that judgment. There are a number of errors assigned, only a few of which are relied upon.

In the first place it is claimed by the defendant in error that the plaintiff in error, David H. Evans, having no insurable interest in the life of Georgia Hamilton, that she could not make him a beneficiary, either by assignment or otherwise. It is claimed, however, on behalf of the defendant in error, that the Supreme Court of Ohio has decided that question.

There is a straight and square conflict in the authorities in the courts of the various states as to whether or not a person not having an insurable interest in the life of the insured can take and accept, by assignment of or original policy taken out in the first place upon the life of the insured—that no person

except those who are related by blood or affinity or who are the creditors or the sureties of the insured and those having some insurable interest in the life of the person insured can take a transfer or assignment of the policy.

The largest number of the state courts of the Union (a collection of cases is made in Elliott on Insurance) seems to be in favor of the doctrine that a policy of life insurance is like any other chose in action, and may pass by assignment, regardless of the insurable interest that the assignee may have in the life of the insured. The United States Supreme Court and the federal courts generally, and quite a number of state courts, hold to the other proposition and principle, that no person except those having insurable interest in the life of the insured can take such an assignment of a policy; that it is a wagering contract; that it is against public policy, and therefore void; that it stimulates and creates a desire on the part of the persons receiving the assignment that the death of the insured may be hastened. And it is set out by the authorities that claim the opposite doctrine that the persons who stand in the relation to the insured growing out of affinity or contingent affinity, blood, or a debtor or surety, have a tie that interests them in the continuation of the life of the insured; a sort of correlative proposition that offsets the interest or desire they may have to hasten the death of the insured.

It is claimed, however, that the Supreme Court of Ohio, in the case of *Eckel* v. *Renner*, 41 O. S., 232, decides this question in favor of the assignment of policies to those who have no insurable interest. It seems that, in this case, a gentleman took out a policy of insurance upon his own life, for his own benefit, and kept it alive by the due payment of premiums, for the sum of one thousand dollars. He had neither wife nor child, but became fond, it is said, of a child about nine years of age, the daughter of a friend of his, and that he assigned the policy to her and delivered the policy to her father for her. He subsequently died, during the minority of the child. It was held that one who has obtained a valid insurance upon his own life, may dispose of it as he sees fit in the absence of prohibitory leg-

islation, or contract stipulation. It is immaterial, in such case, that the assignee has no insurable interest in the life.

It will be observed, by the facts already stated in this case, that they contain no element of traffic or contract relation or burdens assumed on the part of the donee or transferree of this policy to the person whose life was insured; that the assignor paid all the premiums, both before and after the assignment, and delivered it to the father of the child; that the child was only nine years of age, and was, at the time, and perhaps during all the time of her minority and until the decease of the assignor, incapable of entertaining any desire for the death of the insured.

It will be further observed that no burden was cast upon the assignee, the child, or the father of the child, by way of the payment of premiums or any other thing to be performed. In other words, that it was purely and simply a gift from the insured, who had neither wife nor child, to this child that he had become fond of; that the paper policy evidencing the gift itself was delivered to the father, properly assigned, to be delivered to the child and for her. Therefore it would seem evident, from the facts in that case, that it was simply the execution by delivery of the gift of the policy; no one dependent upon the payment by the insured of all premiums thereafter; no burden cast upon the assignee to do anything; no contract or arrangement entered into by the insured and the assignee, the child, or the father for her, that he was to do any single thing by way of accepting and assuming any burdens in that relation.

Now, this case has often been cited by courts and by counsel in cases involving the delivery of gifts from donor to donee as showing when the delivery takes place, in fact, as often cited for that purpose as any other; while in the text-books on insurance it is cited as authority in Ohio for the proposition that one having no insurable interest may take, by assignment, a policy of insurance. But it will be observed that the holding of the court goes beyond the facts in the case. It may be further observed that the court in the case did not publish any syllabus to the case; and, as we all know, the syllabus contains the law of any case decided since, I believe, the 5th Ohio Statutes. No

syllabus appears in any published reports of this case. I have given, substantially, the whole of the case—a case of such importance that if the Supreme Court intended to lay down such an important rule in regard to the transfer of life insurance policies, it would seem that some consideration would have been given to the case; a fuller statement made; the syllabus would have been published and the authorities more or less reviewed. We must take all decisions of all courts as referring to particular facts that they have under consideration; and, as I have before related, the facts in this case did not warrant the court, nor perhaps did the court intend to lay down the general rule in regard to the transfer of life insurance policies. At least, the facts did not warrant it.

We are, therefore, of the opinion that so far as that case is concerned and the facts stated upon which the decision is based, it does not contain a statement of the law of Ohio on that subject. Being, therefore, without any recognized authority, as we view it, in Ohio, in regard to the assignment of such policies to persons having no interest in the life of the insured, the matter rests with this court as an initial proposition. And, there being a conflict of authorities in the different states of the Union—a square conflict—in regard to it, we should be governed more by the reason and logic of the different propositions than by the decided cases, unless their reasons appeal to us. Therefore, it is not in the number of decided casees we must look to find the true principle which should govern, but rather to the right reason and the better reason and the better logic that underlies the truth to be decided.

As we said before, and as set out by Justice Field in deciding the case of *Warnock* v. *Davis*, reported in 104 U. S., 783, decided in 1882, persons who take out and who become the assignees of the policy of insurance upon the life of another in whose life they have no interest, no interest by blood, love, natural affection, by debt created, or a surety or liability incurred which would offset the desire on the part of the assignee to hasten the death of the insured, rest their interest upon nothing but a speculative or wagering basis.

Take the facts in this case. The plaintiff in error, Mr. Evans, according to his own statement, was to receive these policies, and to receive them upon this condition: That he was to pay the premiums on the policies during her life and, at her death, he was to bury her and disinter the bodies of her mother and sister and brother I believe, who were buried in the old Kelly cemetery, and transfer them to the new cemetery. There was a direct contract—the contract that he was to have these policies after those expenses were paid out of the policies.

All in excess of the money that he paid out, or that he would have paid out after the death of the insured, Georgia Hamilton Moore, in burying her and removing the bodies of her mother and other members of her family—the balance was to be his. Now, as Justice Field says, all over and above this actual outlay rested in—What? A pure speculation, a wagering, if you please, upon her death. No tie of relationship, no blood, no natural love or affection, no debt, no surety upon which she was bound for her debt, no obligation in the world rested upon him, outside of the premiums that he might pay and these other debts for the transferring of the bodies and her burial; and as to what was over and above that, it was simply speculative and wagering, depending upon her death, and he, Evans, would have a direct interest in hastening her death. As in other cases just like this, we have the same spectacle in the court here of a woman insured, in failing health, for some time before she died afflicted with consumption, all parties and she herself knowing that it was only a question of a short time when she must die; and then we have the unseemly spectacle that we have had in this case in this court, of a fight before the death of the insured for the money.

Now, to prevent such things as that, to prevent this speculation, this wagering, the healthy rule, as we think, has been adopted by the United States Supreme Court and the federal courts, by which they say that a person having no insurable interest, a stranger to the blood, to whom no debt is owing by the insured, no surety or other contract obligation by the assignee for the insured by which to offset the desire on the part of the

transferree to hasten the death of the insured—that under such circumstances it seems to us that the better rule, the rule of public policy, the rule which would forbid and shut out just such cases as the one we have now before us, is the wise and beneficent rule based upon principles of public policy. That no person should be allowed to speculate or wager upon the death of another, and then do those things or create a desire in the breast of the assignee of the person insured where he would reap the direct money value should death be brought about.

Now, it is useless for us to go over the authorities. May and Elliott on Insurance both lay down both principles and give the authorities and states that hold them, and it would be useless for us to go over the authorities *pro* and *con*. They come down simply to the one simple, naked proposition. It is said by counsel that the case of *Eckel* v. *Renner* has become the rule, as it were, in regard to life insurance policies in Ohio, and that they have since that case was decided been transferred *ad libitum,* the same as any other chose in action is assigned and transferred; and that it would interfere with the business and commercial trade that has already been instituted, and the business relations of the people between the insured and the assignee, or those holding policies would be disturbed. We can not hold to that view for the reason that the view we do hold makes safe and sound and whole any person who has advanced money under circumstances like this in regard to policies, and that he must be paid his advancement, together with six per cent. interest. And certainly if those advancing or trading in policies get back what they have paid, with the usual interest, they can not complain and would be protected.

Now, it is hardly necessary for the court to go into an examination of this record, but we will examine one or two exceptions, briefly. Mr. O'Shaughnessy was called as a witness for defendant. On page twenty-nine of the record he was asked this question: "I will ask you if Mr. Hamilton said anything with reference to the change of beneficiary and transfer of the policies? What did he say?" Objection was made by the defendant and the objection sustained. Counsel for defendant stated that they expected witness to state that Mr. Hamilton,

beneficiary under one of the policies, was present and consented
to the change, and stated that he had been advising his daughter
to make the change.  He was then asked, substantially, the same
question; to which he testified that Mr. Hamilton said he had
been advising his daughter to turn them over to Mr. Evans;
it was the best thing she could do, for he couldn't help her and
the boy couldn't help her, and he knew that Evans would treat
them right.    The question that was answered was, substan-
tially, the one that the court ruled out.

On page thirty-one, on re-direct examination, the same wit-
ness was asked: "I will ask you if in that conversation Mr.
Hamilton made this statement, in answer to a question from
me, whether he knew what the agreement was between Georgia
and Evans: 'It was the understanding that he was to pay the
doctor bill and the funeral expenses, and buy a lot in Woodland
and also give me money to raise my people in Kelly's graveyard
—five up there.'  Did you hear him make that statement?"
Objection by defendant and objection sustained.    Then the
following question: "I will ask you if you heard him say in
that same conversation, in answer to this question: 'You never
heard the agreement between Georgia and Dice?' If he said, 'I
heard it talked over in the house frequently.' "  And then this
question was asked him: " 'What do you say it was?'  And did
he say, 'He was to pay the doctor bill.  You expect a person to
be sick before they die.  And give her a first-class funeral;
buy a lot in Woodland and raise my family or give me money to
raise my family and take them to Woodland.  Three boys;
small fellows.'  Did he say that?"  And the answer was "Yes,
sir; he did."  That is substantially the same question as be-
fore, the same purport and meaning; and no substantial preju-
dice could arise.

This question was asked of Mary Barron: "State to the court
what that conversation was."  (This is a conversation she had
with the deceased.)    "A.  I asked her if her being married
now would make any difference with these policies, and she said
'No, she didn't think so.' "  This answer, on motion of plaintiff,
was excluded.    That, it appears to the court, was not substan-
tially evidence, but simply an opinion that she expressed, that

she didn't think her marriage would have anything to do with the policies.

On page fifty-seven Mrs. Mayne testified that Mr. Moore came to her house and they had a conversation something like this: "He came to my house and told me his reasons for coming. I says 'I can't go and testify a thing in your favor.' And he says 'you can swear I was good to my wife,' and I says, 'Yes, I can; but that has nothing to do with Evans carrying this insurance long before you knew that family.' I says, 'You was only married to her such a few months, why do you want what is rightfully Mr. Evans' ?' And he says, 'I took out insurance for my wife after I married her. That is why I want her insurance.' That's just the conversation we had."

Now, that did not bear upon any issue in the case. It was simply a conversation as to what she knew; and nothing was expressed in the conversation of any material value, reflecting upon the issues in the case.

On page fifty-eight, the funeral director was called and asked whether or not Evans had come to make any arrangements, after the death of Mrs. Moore, as to her funeral, and the court excluded it. There was no contest, so far as the issues in this case are concerned, as to the fact that Evans was ready and willing to perform his part of the contract. No issue was made as to that anywhere in the evidence; and the evidence being objected to and then offered on the part of Evans again when Evans testified, was then excluded by a remark of the court that it didn't make any difference, it seems to us it would not; because, by the objection, the defendant himself would be estopped from afterwards claiming that no effort was made on the part of Evans to carry out his promise to bury the deceased.

Now, there has been a great deal of argument here as to the question whether or not this judgment was against the manifest weight of the evidence. As to that, we have but little to say. We might go over all this evidence in detail, and at the same time would not express our opinion upon the subject any clearer than to say we have listened patiently and have read considerable of the testimony outside of that read by the attorneys, in our consultation. The whole case of the plaintiff below rested

upon the testimony of Mr. Hamilton, the old gentleman.   His testimony is indefinite as to the time the conversation took place or where it took place; but he does say that he heard it, and that Evans agreed with his daughter at that time that he would take the policies, and he was to bury her and take up the bodies of his wife and three little children from the old Kelly cemetery and remove them; and she had the right to have the policies returned at any time during her life, upon her demand, and upon her paying to him what he had expended, together with eight per cent. interest.

If the old gentleman is to be believed, this would probably make out the case.   But, as opposed to this is the declaration, or the declarations, of the deceased, Georgia Hamilton, as to what the contract was; the testimony of Mr. Evans as to what it was; and the larger number of witnesses who testified by way of contradiction to Mr. Hamilton and what Mr. Hamilton said, up in the office of Mr. Belcher, where he made no such claim as that the policies were to be returned to her in her lifetime, upon her demand, and that she was to pay Evans what he had paid out, together with eight per cent. interest.   No mention was made of that in any conversation detailed by any witness with Mr. Hamilton; but he always stopped short of that and said that he was to pay the funeral expenses and to disinter the bodies of his wife and children and to pay her doctor bill.

It devolved upon the plaintiff below to make out his case by preponderance of the evidence; and if we were deciding the case, we would have to say it was manifestly against the weight of the evidence and would so do.   But for the ruling of the court upon the proposition of the law. the case would be reversed. As it is, the case will be affirmed.